IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Nicholas Lopez, et al,                                                         Case No. 3:08CV01132

        Appellants,

v.                                                                                        ORDER

Thomas S. Zaremba,

        Appellee.

This is an appeal from a ruling by the United States Bankruptcy Court for the Northern District of Ohio, Western Division, denying the claims of Nicholas and Sylvia Lopez [claimants], in the liquidation of two brokerage corporations, Continental Capital Services, Inc. [CCS], and Continental Capital Investment Services, Inc. [collectively, the debtors] [Doc. 1]. The claimants argue that they are the debtors' "customers" under the Securities Investor Protection Act [SIPA], 15 U.S.C. § 78aaa, et seq., and that they are entitled to a customer property distribution in the liquidation proceeding.  The Honorable Mary Ann Whipple, Bankruptcy Judge, granted summary judgment for the defendant, Thomas Zaremba, the trustee of the debtors on April 3, 2008, holding that the claimants were not entitled to protected status.

1

This court has jurisdiction over appeals under 28 U.S.C. § 158(a)(1) and Fed. R. Bankr. P. 8001. For the following reasons, I affirm Judge Whipple's ruling.

## Standard of Review

This Court will independently review the decision of the Bankruptcy Court. *See Nardei v. Maughan (In re Maughan),* 340 F.3d 337, 341 (6th Cir. 2003). Generally, I review the Bankruptcy Court's findings of fact for clear error and conclusions of law *de novo. See* Fed. R. Bankr. P. 8013; *Behlke v. Eisen (In re Belke),* 358 F.3d 429, 433 (6th Cir. 2004); *First Options v. Kaplan,* 514 U.S. 938 (1995). The standard of review for a Bankruptcy Court's grant of summary judgment is *de novo. Int'l Union, UAW v. Aguirre,* 410 F.3d 297, 301 (6th Cir. 2005). The definition of statutory terms, such as the term "customer" in SIPA, 15 U.S.C. § 78fff-2(c)(1), is a question of law entitled to *de novo* review. *See SIPC v. Wise,* 750 F.2d 464 (5th Cir. 1985).

## Background

William Davis, an investment advisor, founded the debtor corporation, CCS, and its affiliated corporation, Continental Capital Corporation [CCC]. Davis committed continuing Ponzi frauds over several years, leaving CCS and CCC insolvent, and depriving many of the investors he advised of their savings.

CCS, a Michigan corporation, and CCC, an Ohio corporation, are separate entities. Prior to 1991, the entity presently known as CCS was named Continental Capital Corporation. In 1999, this entity changed its name to CCS and registered in Ohio. The currently existing CCC incorporated in 1991 as a separate Ohio corporation. Neither CCC nor another related entity, Continental Capital Advisers [CCA] are debtors in this case.

The claimant, Dr. Nicholas Lopez, is a physician at Toledo Clinic, Inc. Dr. Lopez participated in the Employee's Profit Sharing Plan and Trust of Toledo Clinic, Inc. [the Plan]. United Missouri Bank of Kansas City, N.A. [UMB], is trustee of the Plan. Sylvia Lopez, also a claimant, is Dr. Lopez's wife.

Under the Plan's Master Trust Agreement, UMB maintained a separate individual account for the benefit of Dr. Lopez containing only funds contributed by or on behalf of Dr. Lopez. The Plan permits Dr. Lopez to direct the investment of funds in his account. To exercise this power, he had to submit signed written directions to UMB. The Plan also allowed him to appoint an investment advisor by submitting an authorization letter to UMB.

Davis was an investment advisor for Dr. Lopez's UMB individual pension account. The letter authorizing Davis to act as Dr. Lopez's investment advisor is not in evidence, but UMB paid management fees to non-debtor CCA from Dr. Lopez's individual plan account. Davis or his staff prepared investment directives and sent them to UMB. The Plan required Lopez to sign each directive. UMB then used funds from Dr. Lopez's individual account to purchase securities.

In dispute are eight directives; Dr. Lopez purportedly signed each directive, but he claims that he did not authorize them and that Davis or his associates forged his signatures. The directives instruct UMB to purchase certain securities with funds from Lopez's account, and to retain those securities.

Three of the disputed directives involve investments in Centrum Industries, Inc. [Centrum]. Directive 1, dated October 15, 1993, instructed UMB to purchase five units in Centrum for $50,000 by mailing a check payable to Centrum to CCC. Directive 2, dated September 5, 1994, instructed UMB to purchase two units in Centrum for $11,000 by mailing a check to CCC. Directive 3, dated

3

March 30, 1996, instructed UMB to purchase two units in Centrum for $36,000 by mailing a check payable to Centrum to CCC.

Five of the disputed directives involve investments in Eclipse Inc. [Eclipse]. Directive 4, undated, instructs UMB to purchase one thousand shares of Eclipse for five dollars per share by mailing a check payable to "Virginia Mack" to the debtor, CCS. Directive 5, dated March 22, 1994, instructs the purchase one-half unit in Eclipse for $12,500 by mailing a check payable to Eclipse to CCC. Directive 6, dated April 30, 1992, instructs UMB to purchase two units of Eclipse for $50,000, but provides no further direction. Directive 7, which has an illegible date, instructs UMB to purchase two units of Eclipse by mailing a check payable to Eclipse to the debtor, CCS. Directive 8, dated March 18, 1997, instructs UMB to purchase three thousand shares of Eclipse stock for at total of $15,000. Directive 8 also instructs UMB to purchase thirty shares of Active Leisure, Inc. [Active Leisure] stock for a total of $42,000.

UMB carried out the first seven directives. UMB did not, however, act on Directive 8, and therefore purchased neither the three thousand shares of Eclipse nor the thirty shares of Active Leisure on Lopez's behalf. UMB received interest and dividend payments on the investments in Centrum and Eclipse, and UMB credited these to Lopez's individual account. Between 1994 and 1998, Lopez's account received $72,900 interest and dividend payments from these investments.

UMB provided Lopez with account statements that detailed the investments held in his individual account and the interest and dividend payments received. On April 21, 1997, Lopez wrote to Davis requesting an update on certain investments and instructing Davis to buy or sell no further investments. Lopez claims that Davis had approached him about investing in Active Leisure, but that he was not interested. On April 30, 1997, Davis sent Lopez a letter describing in detail Lopez's

4

investment in Centrum, noting that Centrum stock had increased in value by 56% in the last year, and predicting future increases. In June 1997, Lopez also requested and received a report from Davis in June 1997 listing the investments in his UMB pension plan account.

In mid-1997, the claimants ended their business dealings with Davis.

In 2001, claimants and UMB filed a lawsuit in the Lucas County Common Pleas Court against CCC, but not the debtor corporations, for breach of contract, fraudulent misrepresentation, negligent misrepresentation, breach of duty to provide reasonable investment advice, and breach of fiduciary duty. Claimants alleged that Davis made high-risk, non-liquid investments with their funds despite their clear instruction to Davis that they wished only to make conservative investments, and that Davis assured them that the investments he made were consistent with their objectives. Claimants also allege that Davis misrepresented the value and marketability of their investments in Centrum and other securities, that they did not liquidate these investments in reliance on his advice, and that those investments rapidly declined in value. Claimants also allege that Davis failed to follow their instructions not to buy or sell investments in Active Leisure in Eclipse. On January 5, 2004, the court awarded a consent judgment in favor of the claimants and UMB against CCC for $206,000.

The Securities Investor Protection Corporation [SIPC] filed a Complaint and Application against the debtors, CCS and CCIS. On September 29, 2003, the United States District Court for the Northern District of Ohio began a SIPA liquidation of the debtor corporations, finding that the debtors' customers were entitled to SIPA protections and appointing Thomas S. Zaremba as the liquidation trustee. The district court ordered the proceeding be removed to United States Bankruptcy Court for the Northern District of Ohio under 15 U.S.C. § 78eee(b)(4).

The claimants filed a timely customer claim with the trustee for $233,250. On April 4, 2006, the trustee denied their claim. The trustee concluded that the claimants' investment in Eclipse, Centrum, and other securities were legitimate transactions when made, despite their subsequent loss of value, and that the claimants' losses could not be compensated under SIPA because the losses resulted from the investments' poor performance. The trustee noted that although claimants stated that some investments were unauthorized the claimants nevertheless accepted returns on those investments.

The claimants timely objected to the trustee's determination in the Bankruptcy Court, and the parties filed cross-motions for summary judgment. On April 3, 2008, the Judge Whipple granted the trustee's motion for summary judgment, holding that the claimants were not "customers" of the debtors within the meaning of SIPA and denying their customer claim. The claimants timely filed this appeal.

## Discussion

### 1. SIPA "Customers"

The claimants seek protection under SIPA, but the trustee asserts that they are not the type of claimant SIPA protects. SIPA protects investors whose stockbrokers experience financial difficulty. *See generally* [SIPC v. Barbour, 421 U.S. 412 (1975)](). Congress enacted SIPA after a waive of brokerage house failures in the late 1960s to protect the assets of investors held by securities broker-dealers who become insolvent. [SIPC v. Pepperdine Univ., 925 F.2d 325, 326 (9th Cir. 1991)]().

A SIPA liquidation procedure is "essentially a bankruptcy proceeding" for financially troubled broker-dealers. [SIPC v. Ambassador Church Finance/Development Group, Inc., 788 F.2d]()

1208, 1210 (6th Cir. 1986). In this liquidation, "customers" of insolvent securities broker-dealers receive preference over general creditors in the distribution of a fund designated customer property. *In re Bell & Beckwith,* 66 B.R. 703, 705 (N.D. Ohio 1986). Also, the Securities Investor Protection Corporation [SIPC] may advance funds to pay allowable customer claims if an insolvent firm's fund of customer property is insufficient to satisfy customer net equity claims. *See* 15 U.S.C. § 78fff-3(a); *In re New Times Sec. Servs.,* 371 F.3d 68, 72-73 (2d Cir. 2004).

If a claimant can establish status as a customer and the amount owed by the debtor, the SIPA trustee discharges the debtor broker-dealer's obligations to such customer. 15 U.S.C. § 78fff-2(b). SIPC advances the necessary funds to the trustee, and the trustee satisfies the customer claims to the extent allowed by statute. 15 U.S.C. § 78fff-3(a). SIPC then has a claim against the broker-dealer to the extent of its advances, but its claim is subrogated to the claims of customers. *Id.* First, SIPC may assert its claim against the fund of customer property, and second, SIPC may assert its claim against the general estate as an unsecured creditor (along with customers not made whole by SIPC advances and distributions from the fund of customer property). 15 U.S.C. § 78fff-2(c)(1); *SEC v. Albert & Maguire Securities, Co.,* 560 F.2d 569, 573 (3d Cir. 1977).

"Customer" under SIPA is a term of art encompassing only a limited class of claimants in a liquidation proceeding. The definition of "customer" in SIPA, 15 U.S.C. § 78lll(2), includes

> any person . . . who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effectuating transfer.

7

The definition of "customer" also includes "any person who has a claim against the debtor arising out of the sales or conversions of such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities." *Id.* Claimants who are not customers are general creditors of the firm and must share in the general estate. 15 U.S.C. § 78fff-2(c)(1).

To preserve often-scarce assets for SIPA's intended beneficiaries, courts have narrowly construed the definition of "customer." *See, e.g., Stafford v. Giddens,* 463 F.3d 125, 127 (2d Cir. 2006); *Wise, supra,* 750 F.2d at 472; *SEC v. Albert & Maguire Securities Co., Inc.*, 560 F.2d 569 (3d Cir. 1977); *In re A.R. Baron,* 226 B.R. 790, 795 (Bankr. S.D.N.Y. 1995); *In re Kline, Maus & Shire, Inc.,* 301 B.R. 408, 418 (Bankr. S.D.N.Y. 2003) (collecting cases).

"Customers" include investors who have either entrusted securities to the brokerage in the ordinary course of its business or deposited cash with the brokerage for the purpose of purchasing securities. *Focht v. Heebner,* 223 F.3d 1296, 1300 (11th Cir. 2000); *In re Brentwood Sec., Inc.,* 925 F.2d 325, 327 (9th Cir.1991).  If the debtor-broker owes the entrusted securities or deposited cash to the investor on the SIPA filing date, the investor has a "customer" claim. *Klein, Maus & Shire., Inc., supra,* 301 B.R. at 419.

SIPA, however, protects investors only in "those situations where the loss arises directly from the insolvency of the broker-dealer"; it does not insure against all risks associated with investing through a broker-dealer.  *In re Bell & Beckwith,* 124 B.R. 35, 36 (Bankr. N.D. Ohio 1990). SIPA does not protect customer claims based on fraud or breach of contract because the broker-dealer's actions would injure the customer regardless of the broker-dealer's solvency. *Id.; SIPC v. Oberweis Sec. Inc.,* 135 B.R. 842, 846 (Bankr. N.D. Ill. 1991). SIPA "does not comprehensively

protect investors from the risk that some deals will go bad or that some securities issuers will behave dishonestly." *In re Brentwood, supra,* 925 F.2d at 330.

A claimant bears a burden of proving "customer" status as defined by SIPA, 15 U.S.C. § 78lll(2). *Ahammed v. SIPC,* 295 F.3d 100, 107 (10th Cir. 2002); *SIPC v. Wise*, 750 F.2d 464, 472 (5th Cir. 1985).

### 2. Whether Claimants are SIPA "Customers."

The claimants advance three arguments as to why they are entitled to SIPA customer protection. First, they argue that the Bankruptcy Court erroneously required them to show that they had deposited cash in an *account* held by the debtors, claiming that so long as the debtor eventually obtained the claimant's cash for the purposes of purchasing securities, the claimants are customers of the debtors. Second, they argue that the claimants became the debtors' customers when the debtor unlawfully converted the claimant's funds with forged directives. Third, they argue that the physical delivery of checks made out to the issuers of the securities by UMB to the debtor constitutes actual entrustment of the claimants' funds. For the following reasons, I find none of these arguments persuasive and conclude that the claimants are not "customers" under SIPA.

### A. The Bright-Line "Actual Entrustment" Rule for Determining SIPA Customer Status.

Dr. Lopez urges that the Bankruptcy Court erroneously interpreted the clause "on account of securities received, acquired, or held by the debtor" as requiring him to have a formal "account" with the debtor to have customer status based on cash deposited with the debtors. *See* 15 U.S.C. § 78lll(2). His argument misconstrues the Bankruptcy Court's opinion, and his focus on the word "account" is misplaced.

9

For a claimant to be a "customer", the claimant must actually have entrusted the funds in question to the debtor broker-dealer. Under SIPA, 15 U.S.C. § 78lll(2), a "customer" includes only those whose claims arise from "securities received, acquired, or held *by the debtor* in the ordinary course of its business as a broker or dealer" or those who has "deposited cash with the debtor" (emphasis added).  Courts have adopted a "bright-line" rule that a claimant must have actually deposited cash or securities with the debtor in order to qualify as a customer. *See Wise, supra,* 750 F.2d at 469. Absent entrustment of cash or securities to a broker-dealer, an investor is "not a customer and therefore not entitled to recover from the SIPC trust fund." *In re Brentwood Securities, supra,* 925 F.2d at 327. Because Lopez cannot show that the debtors actually "received, acquired, or held" cash or securities owned by him, he is not a "customer."

### B. Whether the Allegedly Forged Investment Directives Sent by Debtor to UMB Satisfy the Requirement of Actual Entrustment.

The fact that the debtor issued and UMB followed investment directives concerning the use of claimants' funds does not demonstrate actual entrustment of funds to the debtors, even if those directives were forged.

A claimant is not a "customer" simply because a third party holder handled the claimant's assets in accordance with the debtor's investment instructions. In *SEC v. Kenneth Bove & Co.,* 370 F. Supp. 697, 698 (S.D.N.Y. 1974), the claimants asserted that they were "customers" because they had arranged to sell securities to the debtor broker-dealer. The claimants never actually delivered the securities to the debtor, but rather followed the debtor's alleged instructions to deliver the securities to a third party brokerage house. *Id.* at 699. When the debtor entered SIPA liquidation, the claimants asserted that they were "customers" and made a claim for the cash the debtor had promised to pay them for the securities. *Id.*

Based on SIPA's language and legislative history and applying a "bright-line" rule, the court held that the "absence of actual receipt, acquisition or possession" of the claimant's property by the debtor precludes the claimant from SIPA customer protection because actual entrustment of assets to the debtor is a "*sine qua non*" of SIPA protection. *Id.* at 700.

The court further concluded that the claimant's entrustment of property to a third party broker-dealer as part of an agreement with the debtor was not constructive delivery to the debtor. Compliance with the debtors' instructions to deliver securities to a third party does not, the court stated, "result in the receipt, acquisition or holding of the securities by the debtor" within the meaning of SIPA. *Id.*

Even where the debtor abused its authority and unlawfully converted a claimant's property, the claimant is not a customer unless the claimant entrusted the funds to the debtor. In *Wise, supra,* 750 F.2d at 471, the court held that a claimant was not a "customer." The claimant owned bonds and stored them in a safekeeping account bearing the debtor broker-dealer's name, and the parties agreed that the debtor would clip coupons from the bonds. *Id.* at 470. The debtor, however, unlawfully removed the bonds from the bank, and then became insolvent. *Id.* at 469.

The court concluded that the claimant was not a "customer" because the debtor had not received, acquired or held the claimant's securities. The debtor did not "hold" the bonds merely because the debtor had access to them. *Id.* at 471. If the claimant had "instructed the debtor to remove the bonds from safekeeping for sale" or if the debtor "cashed coupons clipped from the bonds . . . but had failed to remit the money" to the claimant, the court reasoned that the claimant would have a "customer" claim under SIPA. *Id.*

11

In the instant case, the directives, even if forged, did not result in actual entrustment of funds to the debtors. First, as in *Kenneth Bove,* the mere fact that the debtor issued directives and UMB followed them does not mean that the debtor held, received or acquired claimant's funds. UMB, not the debtor, held and managed Dr. Lopez's funds and securities according to the Toledo Clinic Master Trust. The account statements documenting the disputed transactions are statements of Lopez's individual pension account at UMB, and they were generated by and received from UMB.

To be sure, Davis provided, on one occasion and at Lopez's request, a summary of investments. But that summary identified the account as a UMB account. There is no evidence that Lopez directly transferred funds to the debtor: his argument relies on his contention that issuing investment directives is a form of control or acquisition. According to *Kenneth Bove*, however, such directives do not satisfy the bright-line rule of actual entrustment.

Second, the fact that the debtors may have forged the directives does not prove that claimant entrusted the funds to the debtors. Like the debtor in *Wise,* Davis and his associates abused their authority by forging the directives. This, however, does not mean that claimant entrusted funds to the debtors. Moreover, Dr. Lopez did not even grant the debtors the limited access to his assets that the claimant gave the debtors in *Wise.* Rather, the debtors' only role in this case was to instruct the investment of funds. Because this role did not involve a right to access or receive the claimants' funds, the claimants' argument is even weaker than the one rejected in *Wise*.

### C. Whether Physical Delivery of Checks to the Debtor Satisfies the Bright-Line Rule of Actual Entrustment.

Lopez further contends that the physical delivery of checks from UMB to the debtors so that the debtor could deliver those checks to securities issuers constituted the debtors' actual acquisition or possession of the claimant's cash.

Checks are neither "cash" nor "securities" within the meaning of SIPA's definition of "customer," and therefore a claimant is not automatically a "customer" based on the delivery of a check to the debtor. 15 U.S.C. § 78lll(2). *In re Brentwood, supra,* 925 F.2d at 328. A claimant who gives a check to a debtor is only a customer if the "brokerage firm actually received, acquired, or possessed Claimant's property" as a result of the transaction. *Ahammed, supra.,* 295 F.3d at 1107.

For a debtor to have received, acquired or possessed the claimant's cash, the debtor must have had "control" over the funds in question. In *In re Old Naples Securities, Inc.*, 223 F.3d 1296, 1304 (11th Cir. 2000), the claimants' funds were deposited with an affiliate of the debtor, and both the debtor and the affiliate had access to the funds. The court concluded that the "debtor brokerage acquired control over all the claimant's funds" because of the relationship between the debtor and its affiliate, even though the affiliate initially received the claimants' funds. *Id.* Where the claimant has "entrusted" the funds to the debtor, the debtor likely has "control." *Ahammed, supra,* 295 F.3d at 1106; *In re Brentwood, supra,* 925 F.2d at 327.

Generally, mere delivery of checks made out to a third party to an agent of the debtor without giving the debtor authority to cash the check does not make the claimant a SIPA "customer." In *In re Brentwood Securities, supra,* 925 F.2d at 328, the court concluded that the claimants were not SIPA customers. Intending to purchase securities, the claimants delivered checks payable to the issuer of securities to their broker. *Id.* The issuer deposited the checks, and the debtor never accessed the funds in question. *Id.* The court held that the debtor was not "holding their securities because [the issuer] never issued any securities for [the debtor] to hold." *Id.* The court further held that the debtor never held the claimant's cash because claimants "made their checks out directly" to the

13

issuer. *Id.* The debtor was merely an intermediary who was "not involved in the transaction at all." *Id.*

A debtor who receives a check made out to a third party issuer may have "control" over the claimants' funds based on a relationship between the debtor and the third party issuer. In *In re Primeline Securities Corp.,* 295 F.3d 1100, 1108 (10th Cir. 2002), the court concluded that claimants were "customers" of the debtor. Although the claimants invested through an individual broker acting in his individual capacity, the claimants believed the broker represented the debtor brokerage house. *Id.* at 1107-08. The broker used the debtor's letterhead, handed out cards indicating he was a representative of the debtor, and held meetings in the debtor's office. *Id.* Following the individual broker's direction, the claimants wrote checks to one of the individual broker's third-party companies. The individual broker had both actual and apparent authority to act for the debtor, and he in fact took control of the funds because he controlled the issuer of claimant's securities. *Id.* at 1108. The court found that the claimant had entrusted funds to the debtor. *Id.*

In this case, in contrast, UMB's physical delivery of checks made out to the issuers of securities to the debtor did not give the debtor "control" of the claimants' funds. First, the checks themselves were neither cash nor securities, and simply delivering checks does not satisfy the SIPA definition of "customer." As in *Brentwood,* the debtor never obtained any right to access or hold claimants' funds after receiving the check and before passing it on to the issuer. The debtors merely acted as a conduit through which the check itself passed. As the Bankruptcy Judge concluded, there is no evidence that the debtors deposited or cashed those checks, or that they had any right to do so. Moreover, unlike in *Primeline,* there is no evidence that Davis or any other agents of the debtors had control over the issuers of securities that UMB paid as per debtors' directives.

14

**Conclusion**

For the forgoing reasons, it is hereby:

ORDERED THAT Nicholas and Sylvia Lopez's appeal from the judgement of the Bankruptcy Court be, and the same hereby is denied.

So ordered.

s/ James G. Carr
James G. Carr
Chief Judge
